UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 12-cv-1609 (JFB) (AKT)

———————————

DAVID LERNER ASSOCIATES, INC.,

Plaintiff,

VERSUS

PHILADELPHIA INDEMNITY INSURANCE COMPANY,

Defendant.

———————————

**MEMORANDUM AND ORDER**
March 29, 2013

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff David Lerner Associates, Inc. ("plaintiff" or "DLA") brought this action against Philadelphia Indemnity Insurance Company ("defendant" or "Philadelphia") alleging breach of contract and seeking a declaratory judgment that Philadelphia is obligated to indemnify and defend DLA against claims asserted by FINRA[1] and private plaintiffs.[2] These complaints allege that DLA made misrepresentations regarding shares in real estate investment trusts and failed to conduct adequate due diligence of those trusts.

Philadelphia now moves to dismiss the complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, Philadelphia's motion is granted. Specifically, Philadelphia does not have a duty to indemnify or defend DLA in the underlying litigation due to the unambiguous language of the professional services exclusion in the insurance policy, which discharges Philadelphia from defending or indemnifying claims resulting from DLA's performance of "professional services." More specifically, the underlying lawsuits allege, among other things, that DLA, as the underwriter and sole distributor for the Apple REITs, failed to engage in due diligence in connection with the sale of these financial products. These alleged actions or inactions quintessentially and unambiguously fall within a common-sense understanding of the term "professional services," which is not defined in the insurance policy itself. In other words, when

---

[1] The FINRA action is captioned *Department of Enforcement v. David Lerner Associates, Inc. & David Lerner*, Disciplinary Proceeding No. 2009020741901.

[2] The lawsuits brought by the private plaintiffs have been consolidated in *In re Apple REITs Litigation*, No. 11-cv-02919, which is currently pending in the Eastern District of New York.

an underwriter performs due diligence in connection with the sale of financial products, such activity certainly constitutes "professional services" by the plain meaning of the term. This Court's conclusion is consistent with numerous courts in New York, as well as courts in other jurisdictions who have reached the same conclusion under analogous circumstances in states with laws similar to New York in all material respects. Plaintiff cites to no applicable case authority to the contrary. Although plaintiff attempts to point to the definition of "professional" in the context of malpractice law, the New York Court of Appeals itself has emphasized that the term "professional" has many applications in the law, and that the definition of "professional" in malpractice decisions is limited to that particular context. In sum, because the "professional services" exclusion exempts Philadelphia from providing coverage to DLA for these lawsuits, DLA's breach of contract action cannot be maintained, and a declaratory judgment in favor of DLA cannot be issued. Accordingly, dismissal of this lawsuit is warranted.[3]

---

[3] Although plaintiff has not requested leave to re-plead the complaint, the Court has considered whether plaintiff should be given an opportunity to re-plead its claims. Under Rule 15(a) of the Federal Rules of Civil Procedure, the "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, even under this liberal standard, this Court finds that any attempt to amend the pleading in this case would be futile because no amendments could alter the conclusion that, given the allegations in the underlying lawsuits, the professional services exclusion applies to those claims. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("Repleading would [] be futile. Such a futile request to replead should be denied.").

I. BACKGROUND

A. Factual Background

Philadelphia issued Private Company Protection Plus Insurance Policy, Policy No. PHSD577699 ("the policy") and named DLA as the insured. (Compl. ¶ 8.) The policy was effective from November 30, 2010 to November 30, 2011.

Section I of Part 1 of the policy provides:

INDIVIDUAL LIABILITY COVERAGE

The Underwriter [Philadelphia] shall pay on behalf of the Individual Insured, Loss from Claims made against Individual Insureds during the Policy Period (or, if applicable, during the Extending Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, except to the extent the Private Company has indemnified the Individual Insured for such Loss.

A. PRIVATE COMPANY INDEMNITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, if the Private Company has indemnified such Individual Insureds for such Loss.

B. PRIVATE COMPANY LIABILITY COVERAGE

The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against the Private Company during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act.

(*Id.* ¶ 10.) A D&O Wrongful Act is defined by the policy as:

1. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured in his/her capacity as an Individual Insured; or

2. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the Private Company; or

3. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured arising out of serving in his/her capacity as director, officer, governor or trustee of an Outside Entity if such service is at the written request or direction of the Private Company.

(*Id.* ¶ 11.) However, the policy was modified by endorsement to include a "Professional Services Exclusion" which provides:

With respect to coverage under Part 1, the Underwriter shall not be liable to make any payment for Loss in connection with any Claim made against the Insured based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the Insured's performance of or failure to perform professional services for others.

It is provided, however, that the foregoing shall not be applicable to any derivative action or shareholder class action Claim alleging failure to supervise those who performed or failed to perform such professional services.

(*Id.* ¶ 54.) The term "professional services" is not defined in the policy.

DLA, a New York corporation, is a privately held broker-dealer that operates branches in New York and Florida and employs approximately 370 registered representatives. (*See* Compl. Ex. C, Am. Compl. and Request for Expedited Hearing ("FINRA Compl.") ¶ 9.) A real estate investment trust ("REIT") is a company that owns and operates income-producing real estate, and DLA served as the Managing Dealer for the Apple REIT offerings. (Compl. ¶¶ 17-18.)

On May 27, 2011, The Financial Industry Regulatory Authority ("FINRA") filed a complaint in a disciplinary proceeding against DLA, alleging that since January 2011, DLA sold over $300 million worth of shares in a REIT by misrepresenting the value of those shares, while failing to perform adequate due diligence. (Compl. Ex. B, Complaint ¶¶ 1-3.) On December 13 2011, FINRA filed an amended complaint against not only DLA but also David Lerner individually,

3

containing substantively the same allegations, but additionally alleging that DLA sold over $442 million worth of shares in a REIT. (Compl. Ex. C, FINRA Compl. ¶¶ 1-2.) FINRA also alleged that DLA targeted senior citizens and/or unsophisticated investors. (*Id.* ¶¶ 1, 17.)

Between June 17 and June 28, 2011, three class actions were filed against DLA, David Lerner, and other defendants, all arising out of the same facts as detailed in the FINRA Complaint. (*See* Compl. Ex. D, *Kowalski v. Apple REIT Ten, Inc., et al.*, No. 11-cv-2919 (E.D.N.Y.); Compl. Ex. E, *Kronberg v. David Lerner Assocs. Inc., et al.*, No. 11-cv-3558 (D.N.J.); Compl. Ex. F, *Leff v. Apple REIT Ten, Inc., et al.*, No. 11-cv-3094 (E.D.N.Y.).) On December 13, 2011, these actions were consolidated in the Eastern District of New York in front of Judge Matsumoto. (*See* Stipulation and Order Regarding Consolidation, Lead Plaintiff, Lead Counsel and Scheduling, *In re Apple REITs Litig.*, No. 11-cv-2919 (KAM)(JO) (E.D.N.Y. Dec. 13, 2011), ECF No. 78.) On February 16, 2012, another individual lawsuit was filed, and subsequently consolidated in the action in front of Judge Matsumoto. (*See* Compl. Ex. H, *Brody v. David Lerner Assocs. Inc., et al.*, No. 12-cv-782 (E.D.N.Y.).)

DLA notified Philadelphia, a Pennsylvania corporation, of the regulatory action and the private class action so that it could be indemnified for the costs of defending the lawsuits. (Compl. ¶ 53). However, Philadelphia denied coverage, and notified DLA that its acts and omissions were not covered by the policy due to the professional services exclusion. (*Id.* ¶ 54.)

B. Procedural Background

Plaintiff filed the complaint in this diversity action on April 3, 2012. Defendant filed a motion to dismiss the complaint on July 17, 2012. Plaintiff submitted an opposition to the motion to dismiss on August 31, 2012, and defendant replied on September 14, 2012. The Court held oral argument on October 26, 2012.

II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), setting forth a two-pronged approach for courts deciding a motion to dismiss. The Supreme Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to

relief." *Id*. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly*, 550 U.S. at 556-57) (internal citation omitted).

The Court notes that in adjudicating this motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and rev'd in part on other grounds sub nom.*, *Lentell v. Merrill Lynch Co.*, 396 F.3d 161 (2d Cir. 2005).

III. DISCUSSION

A. Applicable Law

Under New York law, an insurer has an "exceedingly broad" duty to defend the insured. *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006) (citation and internal quotation marks omitted). The duty to defend is broader than the duty to indemnify. *See Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 310 (1984) ("Where an insurance policy includes the insurer's promise to defend the insured against specified claims as well as to indemnify for actual liability, the insurer's duty to furnish a defense is broader than its obligation to indemnify."); *see also Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 65 (1991) ("[A]n insurer may be contractually bound to defend even though it may not ultimately be bound to pay, either because its insured is not factually or legally liable or because the occurrence is later proven to be outside the policy's coverage.").

"[A]n insurer will be called upon to provide a defense whenever the allegations of the complaint suggest a reasonable possibility of coverage." *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137 (alteration, citation, and internal quotation marks omitted); *see also Fitzpatrick*, 78 N.Y.2d at 65 ("This Court has repeatedly held that an insurer's duty to defend its insured arises whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy."). An insurer has a duty to defend a claim against its policy holder unless it can "establish, as a matter of law, that there is no possible factual or legal basis on which the insurer might eventually be obligated to indemnify [the insured] under any provision contained in the policy." *Villa Charlotte Bronte, Inc. v. Commercial Union Ins. Co.*, 64 N.Y.2d 846, 848 (1985). An insurer who seeks to be relieved of the duty to defend based on a policy exclusion "bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision."

*Frontier Insulation Contractors. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997); *see also Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 121 (2d Cir. 2012). Further, "[i]f any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action." *Frontier Insulation Contractors*, 91 N.Y.2d at 175.

"Insurance policies are contracts to which the ordinary rules of contractual interpretation apply." *Accessories Biz, Inc. v. Linda & Jay Keane, Inc.*, 533 F. Supp. 2d 381, 386 (S.D.N.Y. 2008). New York insurance contracts are construed in light of "common speech." *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398 (1983); *see also Ment Bros. Iron Works*, 702 F.3d at 122 ("Terms in an insurance contract must be given their plain and ordinary meaning." (citation and internal quotation marks omitted)). Insurance contracts must also be interpreted "according to the reasonable expectations and purposes of ordinary businessman when making an ordinary business contract." *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451, 457 (2005) (internal citations and quotation marks omitted). Ambiguous terms in a policy "must be construed in favor of the insured and against the insurer." *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).

B. Professional Services Exclusion

Defendant argues that, since the insurance policy excludes it from covering claims "in any way involving [DLA]'s performance of or failure to perform professional services for others" (Compl. ¶ 54), plaintiff's suit should be dismissed as defendant is not liable to defend or indemnify plaintiff in the lawsuits regarding REITs. (Def.'s Mem. at 14-15.) Defendant contends that the services performed by DLA in conducting due diligence and selling REITs fall squarely within the professional services exception. In particular, defendant argues:

> Here, the Underlying Actions for which DLA seeks coverage under the Policy uniformly allege that DLA had a duty to perform reasonable due diligence "to understand the potential risks and reward associated with a security it recommends to customers . . ." and that DLA was required to investigate and identify potential "red flags" regarding securities to safeguard its customers from damage. *See,* Complaint, Exhibit C at ¶¶ 88-89. DLA was also allegedly required to exercise care and skill in the preparation of information regarding securities and its presentation of that information to its customers in the course of providing investment advice to ensure that the information is balanced, truthful and free from exaggeration or misleading statements. *See,* Complaint, Exhibit C at ¶ 8. These services that DLA provides to its customers constitute professional services under New York law because they require specialized acumen, skill and training with respect to securities and investments.

(Def.s' Reply Mem. at 2 (footnote omitted).) Plaintiff, on the other hand, argues that, since the term professional services is undefined in the policy, the term is ambiguous and the litigation should proceed. (Pl.'s Opp'n at 7-7-8.) The Court disagrees with plaintiff's interpretation of both New York law and the policy language. As argued by defendant, and discussed below, the common sense understanding of the term "professional services" makes clear that DLA's conduct at issue in these underlying

6

lawsuits unambiguously falls within the meaning of that term and, thus, that the exclusion from coverage applies.

1. Analysis Under New York Law

"Professional services" is neither defined by the policy nor by New York law. When attempting to define a term, the "insurance policy should be read in light of common speech and the reasonable expectations of a businessperson." *Parks & Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 13 A.D.3d 599, 600 (2d Dep't 2004) (quoting *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003))) (internal quotation marks omitted).

In *Reliance Insurance Co. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 262 A.D.2d 64 (1st Dep't 1999), the Appellate Division stated that courts should "[look] to the nature of the conduct under scrutiny rather than the title or position of those involved, as well as to the underlying complaint . . . ." *Id.* at 65 (internal citation omitted); *see also Lumbermens Mut. Cas. Co. v. Flow Int'l Co.*, 844 F. Supp. 2d 286, 302 (N.D.N.Y. 2012) (citing the *Reliance* standard). Applying this standard in the specific context of defining the term "professional services," courts have held that the question of whether one is engaged in a professional service depends on whether those individuals "acted with the special acumen and training of professionals when they engaged in the acts . . . ." *Gen. Ins. Co. of Am. v. City of N.Y.*, No. 04-Civ-8946, 2005 WL 3535113, at *5 (S.D.N.Y. Dec. 23, 2005); *see also Lumbermans*, 844 F. Supp. 2d at 302 (citing the court's test in *General Ins.*, 2005 WL 3535113, at *5). Such a definition is consistent with the directive of both the New York Court of Appeals and the Second Circuit, noted above, that such undefined terms should be "read in light of common speech and the reasonable expectations of a business person." *St. Paul Fire*, 472 F.3d at 421; *accord Belt Painting Corp.*, 100 N.Y.2d at 383; *see also Cont'l Cas. Co. v. JBS Constr. Mgmt., Inc.*, No. 09-Civ-6697, 2010 WL 2834898, at *5 (S.D.N.Y. Jul. 1, 2010) (defining "construction manager" in an insurance policy based on a "common-sense understanding"). Thus, New York courts, as well as federal courts applying New York law, have not limited the scope of insurance policy exclusions for "professional services" to situations involving traditional "professions," such as lawyers, doctors, architects, and engineers. *See, e.g., Westchester Fire Ins. Co. v. Metro. Life Ins. Co.*, 280 A.D.2d 331, 332 (1st Dep't 2001) (applying professional services exclusion to employees of a life insurance company); *Nat'l Union Fire Ins. Co of Pittsburgh, Pa. v. Ambassador Grp., Inc.*, 157 A.D.2d 293, 298 (1st Dep't 1990) (applying professional services exclusion to insurance claim handlers); *see also Hollis Park Manor Nursing Home v. Landmark Am. Ins. Co.*, 803 F. Supp. 2d 205, 209 (E.D.N.Y. 2011) (applying professional services exclusion to employees of a nursing home).

In the instant case, it is clear that the only reasonable interpretation of "professional services" is that individuals engaged in the due diligence and sale of financial products are engaged in professional services. According to the underlying complaints, DLA was an underwriter for Apple REITs. (Compl. Ex. C, FINRA Compl., ¶ 43.) It was required to conduct due diligence for these products, including performing financial analysis and meeting with Apple REIT management. (*Id.* ¶ 44.) DLA then recommended and sold over $442 million of this security. (*Id.* ¶ 1.) These actions, allegedly taken by DLA and individuals within the company, fall

7

squarely within a common-sense understanding of "professional services."

As noted above, the First Department, in *Westchester Fire*, reached a similar conclusion when it held that the professional services exclusion barred coverage for liability stemming from the sale of life insurance. 280 A.D.2d at 332. If the sale of life insurance is considered a professional service, then surely the due diligence and sale of investment products must also be classified in the same manner. Similarly, in *Hollis Park*, the court held that claims arising from the alleged falsification of patient records at a nursing home fell within a professional services exclusion similar to the one in the instant case. 803 F. Supp. 2d at 206-09. In addition, in *Ambassador Group*, the First Department held that the professional services exclusion applied to an alleged failure to properly handle an insurance claim. 157 A.D.2d at 298.

In sum, it is clear under New York law that the allegations in the underlying lawsuits against DLA – relating to its purported failure to, *inter alia*, conduct due diligence on the REITs in connection with providing investment advice to its customers in the sale of this financial product – constitute "professional services" under the common understanding of that term and, thus, the exclusion from coverage under the policy unambiguously applies here.[4]

2. Analysis Under Other States' Laws

Although obviously not binding, the approach that courts in other states (with legal standards on this issue analogous to those of New York) have taken in defining the professional services exclusion is consistent with this Court's conclusion, under New York law, that the alleged conduct by DLA in the underlying lawsuits falls within the plain language of the exclusion.

For example, in *Piper Jaffray Cos., Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 967 F. Supp. 1148 (D. Minn. 1997), the court held that claims that arose from the insured's "alleged failure to prudently manage the assets of its investor" fell within the professional services exclusion that barred coverage for such claims. *Id.* at 1156. Specifically, the court, under Minnesota law, defined a "professional service" as "one calling for specialized skill and knowledge in an occupation" and the "skill required to perform a professional service is predominantly intellectual or mental rather than physical." *Id.* (quoting *Ministers Life v. St. Paul Fire & Marine Ins. Co.*, 483 N.W.2d 88, 91 (Minn. Ct. App. 1992)) (alteration and internal quotation marks omitted). Applying that standard, the court concluded that "[m]anaging investments requires specialized skills and effort which are almost exclusively intellectual" and, therefore, claims relating to the insured's alleged mismanagement of investments were excluded by the policy. *Id.*; *see also Reinhardt v. Certain Underwriters at Lloyd's, London,* No. A06-949, 2007 WL 900731, at *5 (Minn. App. Mar. 27, 2007)

---

[4] Plaintiff argues that the *contra proferentem* rule should apply, which states that "unresolvable ambiguities in insurance contracts are construed in favor of the insured." *Hugo Boss Fashions v. Fed. Ins. Co.*, 252 F.3d 608, 615 (2d Cir. 2001). The Court disagrees because that rule is not triggered "unless this court first determines that the contract is, in fact, ambiguous." *Id.* at 616. Moreover, as the Second Circuit has explained, the fact that a contract "does not specify the meaning of a disputed term does not entail that an ambiguity sufficient to trigger the *contra proferentem* exists." *Id.* at 617. Here, even though the term "professional services" is undefined in the policy, the Court concludes that its definition is unambiguous as applied to the claims at issue in this case. Thus, the *contra proferentem* rule has no application under these circumstances.

8

(holding that "professional services" exclusion applied to services provided as a trust manager and equity-investment manager).

Similarly, in *Aetna Casualty & Surety Co. v. Dannenfeldt*, 778 F. Supp. 484, 496 (D. Ariz. 1991), the court noted that "the case law is in accord that, '[i]n determining whether a particular act is of a professional nature or a 'professional service' we must not look to the title or character of the party performing the act, but to the act itself.'" (quoting *Marx v. Hartford Accident & Indem. Co.*, 183 Neb. 12, 14 (1968)). The court further explained that, "[t]he act itself is not viewed in isolation" and "[c]ourts consistently consider the context of the business or profession in which it is performed." *Id*. Applying this standard, which is analogous to New York law, the court held that the professional services exclusion applied because "the bond sales [at issue] were the final juncture in a chain pursuant to which the bonds were conceived, issued, and marketed to the public" and "were an integral part in marketing sophisticated investment instruments in a savings and loan." *Id*.; *see also MDL Capital Mgmt. v. Fed. Ins. Co.*, 274 F. App'x 169, 173-74 (3d Cir. 2008) (per curiam) ("Assuming the complaint states that [the directors] failed in their capacity as directors of MDL Capital to oversee its activities with respect to the Active Duration Fund, the allegation stems from MDL Capital's purported failure as investment adviser and investment manager. Consequently, the claim arises from the providing of, or failure to provide, professional services and D&O coverage is not available pursuant to the 'Professional Services Exclusion – Complete.'").

As in *Piper* and *Aetna*, the actions alleged in the underlying complaints by FINRA and the private plaintiffs against DLA are "professional services." To perform due diligence on REITs and market those securities, individuals are employed in an occupation, they rely on specialized knowledge or skill, and the skill is mental rather than physical. There is simply no question, based upon the allegations in the underlying lawsuits, that the professional services exclusion applies.

Plaintiff relies on the Second Circuit's opinion in *Northfield Insurance Co. v. Derma Clinic*, 440 F.3d 86 (2d Cir. 2006) to advance the proposition that the term "professional services" is ambiguous and, therefore, the policy must be construed in favor of the insured. However, such reliance is misplaced. In *Northfield*, three women filed lawsuits against a massage therapy company for physical and sexual assault, and the insurance company refused to cover the cost of defending those claims because they argued that assault fell outside the definition of the "professional services" for which the defendants were covered. *Id.* at 88-89. The Second Circuit decided that they could not adequately resolve the case without guidance from the Supreme Court of Connecticut. However, the Court did not state that "professional services" is always ambiguous, but that it was ambiguous whether the training, monitoring, and supervision of masseuses was covered by the professional services clause in the policy under the peculiar circumstances of that case. *Id.* at 93-94. *Northfield* is inapplicable here because the Second Circuit's decision in that case is limited to Connecticut law.

3. Ministerial Exception

Although not advanced in plaintiff's memorandum of law, some have argued that, even if the professional services exception does apply, that "purely ministerial acts requiring no expertise fall without the scope of professional services."

*Piper Jaffray*, 967 F. Supp. at 1156. According to the well-reasoned opinions of some courts, an act is not a professional service "merely because it is performed by a professional"; "it must be necessary for the professional to use his specialized knowledge or training." *Potomac Ins. Co. of Ill. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548, 552 (5th Cir. 2000) (quoting *Atlantic Lloyd's Ins. Co. v. Susman Godfrey*, 982 S.W.2d 472, 476-77 (Tex. App. 1998)) (internal quotation marks omitted). This echoes the *Reliance* standard, which states that courts should "[look] to the nature of the conduct under scrutiny rather than the title or position of those involved . . . ." *Reliance*, 262 A.D.2d at 65.

If plaintiff attempted to argue that the actions taken by DLA employees were ministerial, this argument would fail because performing a due diligence analysis and marketing financial products requires specialized knowledge and training, and is not a rote activity performed by a professional. Even if the actual sale of the REITs required less training or knowledge than the due diligence, that would not negate the large degree of specialized training or knowledge required in all of the other actions performed by DLA. *See, e.g., Aetna*, 778 F. Supp. at 496-97 (holding that the sale of bonds was a professional service because even if the bond representatives were "ill-trained, or untrained" they were "part of the natural progression from conception of the bonds to sale[]" and the sales "were an integral part of marketing sophisticated investment instruments").

### 4. Definition of Professional in Malpractice Lawsuits

Plaintiff's main argument is that financial advisors do not perform professional services since they are not classified as professionals under malpractice law. (Pl.'s Opp'n at 8-9); *see Santiago v. 1370 Broadway Assocs.*, 264 A.D.2d 624, 624-25 (1st Dep't 1999) (holding that, under malpractice law, a "'profession' is an occupation generally associated with long-term educational requirements leading to an advanced degree, licensure evidencing qualifications met prior to engaging in the occupation, and control of the occupation by adherence to standards of conduct, ethics and malpractice liability" and that the field has "traditionally been limited to such 'learned professions' as law, accountancy, architecture, and engineering" (internal citations omitted)).

This argument is unavailing. The New York Court of Appeals has explicitly stated, in a decision involving the statute of limitations for malpractice actions, that "[w]hile the term [professional] has myriad applications in law – as, for example, in insurance policy exclusions and peer negligence standards – we underscore that our definition is limited to the context presented . . . ." *Chase Scientific Research, Inc. v. NIA Grp. Inc.*, 96 N.Y.2d 20, 28 (2001). In *Aetna*, the Court similarly stated that any attempt to define professional services by reference to professional malpractice cases is "misplaced," and that professional services in insurance cases "applie[s] to a far broader range of activities" than under malpractice law. 778 F. Supp. at 495-96. Plaintiff has not cited any cases where a court has used the definition of professional in the malpractice context to define professional services under an insurance policy, and the Court declines to do so in this case. Instead, the Court, as instructed by New York courts, utilizes the common understanding of the term.

### 5. Issue of Discovery

It is well-settled that "save where extrinsic evidence is relevant, the

comparison of a complaint (allegedly triggering a duty to defend) with an insurance policy is ordinarily treated as a matter of law." *Saint Consulting Grp., Inc. v. Endurance Am. Specialty Ins. Co.*, 699 F.3d 544, 550 (1st Cir. 2012); *see also Cardinal v. Long Island Power Auth.*, 309 F. Supp. 2d 376, 391 (E.D.N.Y. 2004) ("The interpretation of an insurance policy is a question of law to be decided by the Court."). In its opposition papers, plaintiff made purely legal arguments as to why the motion to dismiss should be denied – namely, that the term "professional services" is ambiguous and financial advisors and/or underwriters, such as DLA, are not considered "professionals" under existing New York law. (*See* Pl.'s Opp'n at 1 ("Philadelphia improperly based its disclaimer of insurance coverage upon a Professional Services Exclusion which is ambiguous, undefined in the policy issued to DLA and the terms of which are open to differing reasonable interpretations. Furthermore, Philadelphia also asserts that DLA's activities are subject to the Professional Services Exclusion of the policy even though DLA, as a brokerage firm, is not deemed to be a 'professional' under New York law.").) In its opposition papers, plaintiff does not contend that there are any factual disputes in connection with these two legal issues. However, at oral argument, plaintiff's counsel suggested for the first time that, rather than being a pure legal issue as to whether the exclusion applies based upon the allegations in the complaint, there might be a need for some factual discovery to make that determination. For the reasons set forth below, the Court disagrees. As noted above, although there could be situations where the application of a professional services exclusion could not be decided on a motion to dismiss (such as, for example, if the underlying lawsuits contained only vague and conclusory allegations), this is not one of those cases.

As plaintiff conceded in its complaint, one of the central components in the underlying lawsuits is an alleged failure by plaintiff to conduct due diligence with respect to whether there was a reasonable basis for plaintiff to recommend the security to its customers. For example, in its complaint, plaintiff notes:

> The FINRA Complaint further alleges that DLA, in its capacity as best efforts underwriter and sole distributor for all of the *Apple REITs*, solicited numerous customers to purchase *Apple REIT Ten* without performing adequate due diligence to determine that there is a reasonable basis to recommend the security to any customer.
>
> * * *
>
> The FINRA Complaint alleges that DLA violated National Association of Securities Dealers ("NASD") Rules 2310 and 2210(d)(1), and FINRA Rules 2310(b) and 2010, by failing to conduct adequate due diligence, thereby leaving it without a reasonable basis for recommending its customers purchase *Apple REIT Ten*, in addition to using misleading statements regarding the performance of earlier *Apple REITs*.

(Compl. ¶¶ 20, 22.) The FINRA Complaint itself is replete with detailed allegations that DLA, as the underwriter and sole distributor of Apple REITs, failed to perform due diligence required by law before recommending and selling Apple REITs to investors. In fact, the FINRA Complaint has an entire section entitled "DLA's

Insufficient Due Diligence" which contains several paragraphs of how DLA failed to use its professional expertise to conduct due diligence. (Compl. Ex. C, FINRA Compl., ¶¶ 41-44.) For example, in that section, the FINRA Complaint states: "Through its position as underwriter and sole distributor of Apple REITs, DLA was uniquely empowered and had the duty to conduct thorough due diligence of Apple REIT Ten prior to selling it to customers. For example, pursuant to an agency agreement with each of the Apple REITs, DLA can request certain non-public information concerning the 'business and financial condition' of the Apple REITs. DLA has not sufficiently availed itself of this opportunity." (*Id.* ¶ 43.) As noted *supra*, the other complaints against DLA contain similar allegations.

Where the underlying complaints make clear that DLA (as an underwriter and distributor of a financial product) is being sued due to its alleged failure to use its special training and acumen to perform due diligence, it is clear that the professional services exclusion applies. No discovery is necessary to ascertain what the underlying complaints make apparent – namely, that these lawsuits are about DLA's alleged failure to provide professional services in the form of, among other things, due diligence in connection with the sale of a financial product. These alleged failures unquestionably fall within the common-sense understanding of professional services, and no amount of discovery will change that determination based upon the common understanding and meaning of the term "professional services." To hold otherwise would subject insurance companies to costly and unnecessary discovery with respect to the application of an exclusion, even though the detailed allegations in the underlying lawsuits make clear that the exclusion applies. In fact, several courts, including those in some of the cases cited *supra*, similarly found the exclusion to apply at the motion to dismiss stage. *See, e.g.*, *Rupracht v. Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0146LDUSA0701030*, No. 11-CV-654, 2012 WL 4472158, at *5 (D. Nev. Sept. 25, 2012) (dismissing a complaint because the plaintiff only alleged claims that were excluded by the professional services exception); *Hawks v. Am. Escrow, LLC*, No. 09-C-2225, 2012 WL 966059, at *4-5 (N.D. Ill. Mar. 16, 2012) (granting motion to dismiss because the "allegations asserted by the plaintiffs are excluded from coverage pursuant to the plain language of the policy"); *Piper Jaffray*, 967 F. Supp. at 1156-1159 (although declining to dismiss the claims under the professional services exception because the underlying complaint may have alleged a failure to supervise claim, holding on a motion to dismiss that the underlying actions are professional services); *Aetna*, 778 F. Supp. at 495 ("At issue is whether a bond sales representative in a savings and loan new accounts department or teller window performs a professional service. It is a question of law."). Thus, the Court rejects plaintiff's belated assertion at oral argument that discovery may be needed to determine whether the exclusion in this case applies.

### III. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion to dismiss. The Clerk of the Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 29, 2013
　　　　Central Islip, NY

\* \* \*

Philadelphia is represented by Andrew T. Houghton and Jeffrey Dillon, Sedgwick LLP, 125 Broad Street, 39th Floor, New York, NY 10004. DLA is represented by Darren P. Renner and Stephen J. Romano, Keidel, Weldon & Cunningham, LLP, 925 Westchester Avenue, Suite 400, White Plains, NY 10604.